

## NUMBER 13-07-00680-CR

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI - EDINBURG

VALDE GARCIA,                                                           Appellant,

v.

THE STATE OF TEXAS,                                                     Appellee.

**On appeal from the 319th District Court
of Nueces County, Texas.**

## MEMORANDUM OPINION

**Before Justices Rodriguez, Garza, and Vela
Memorandum Opinion by Justice Garza**

A jury found appellant, Valde Garcia, guilty of aggravated robbery, a first-degree felony, and assessed punishment at ten years' imprisonment in the Texas Department of Criminal Justice-Institutional Division with no fine.  *See* TEX. PENAL CODE ANN. § 29.03(a), (b) (Vernon 2003).  By four issues, Garcia contends that:  (1) the evidence supporting his conviction is legally and factually insufficient; (2) the trial court erred in refusing to charge

the jury on the lesser-included offenses of robbery, aggravated assault, and theft; (3) the trial court erred in failing to include an instruction on self-defense or defense of property in the jury charge; and (4) the State's use of Garcia's military service record to impeach his testimony at trial created unfair prejudice. We affirm.

## I. BACKGROUND

On July 12, 2007, Garcia was charged by indictment with the first-degree offense of aggravated robbery. *See* TEX. PENAL CODE ANN. § 29.03(a), (b). Specifically, the indictment provided the following:

> Valde Garcia, defendant, on or about June 20, 2007, in Nueces County, Texas, did then and there, while in the course of committing theft of property and with intent to obtain or maintain control of said property, intentionally or knowingly threaten or place JOSEPH VELA, in fear of imminent bodily injury or death, and the defendant did then and there use or exhibit a deadly weapon, to wit: a knife . . . .

On October 22, 2007, Garcia's jury trial commenced. The State called four witnesses in its case-in-chief—Joseph Vela, the victim, Deputies David Lindner and Rolando Padilla, and Andrew Rich. Garcia and his mother, Martha Barrientes, testified on behalf of the defense.

## A. Joseph Vela's Testimony

Vela testified that on June 20, 2007, he and his friend, Rich, both sixteen years old, were driving home together in Rich's vehicle. Both Vela and Rich worked together on a farm. Vela and Rich passed by Garcia's residence near Bishop, Texas, as they were driving home, and Garcia gestured for them to stop. Vela and Rich had met Garcia through their friendship with Garcia's brother, Manny. Vela had also lent Garcia money on a previous occasion. Vela believed that the reason for the stop was that Garcia wished to pay him back. Rich turned the vehicle around and parked in front of Garcia's house. Vela

2

noted that Garcia was accompanied by a friend named Mario.

Garcia subsequently asked Vela to come over to where he was standing. Vela testified that Garcia then became aggressive towards him and accused him of "messing around" with Manny's girlfriend. As Garcia was interrogating him, Vela noticed that Garcia had begun to get "teary-eyed," his arm muscles tensed up, and he took off his jewelry. Garcia then pushed Vela onto the hood of a car that was parked nearby. After pushing Vela onto the hood of the car, Garcia instructed Vela to wait there while Garcia entered his house. Once Garcia entered the house, Mario told Vela to run; however, Vela chose not to do so because he did not believe that Rich could get his car started in time to flee from Garcia.

After spending a couple of seconds inside his house, Garcia returned. Garcia informed Vela and Rich that if they chose to run, he would catch them and kill them. He also instructed Vela to come inside the house. Vela testified that he went inside Garcia's house because he was forced to do so and that he "felt that he [Garcia] had power over me."[1] Once inside, Garcia locked the dead bolt and the bottom lock of the door and ordered Vela to go the another room, sit on the bed, and not make a sound. After leaving the room for a brief period, Garcia returned with a "knife out on his right side." Vela noted that the knife had a black handle and a silver blade.

Vela testified that Garcia forced him out of the bedroom and into the living room and pushed him onto another bed. At this time, Garcia allegedly put the knife to Vela's neck and asked Vela what he would do if Garcia slit his throat. Vela did not respond because he was in fear for his life. Garcia asked Vela if he had any money on his person to which

---

[1] In corroborating Vela's testimony, Rich noted that: "He [Garcia] was forcing [Vela], and he was behind him. He, [Vela], had nowhere to go, except for in the house."

3

Vela stated he did not. However, Vela informed Garcia that he had $100 at his house and that he could go get it for Garcia. Garcia then let Vela get up, unlocked the door, and told Vela to go outside. Garcia followed Vela outside with the knife still in hand. They both proceeded to Rich's vehicle. Garcia asked Vela "if they have anything of value." Vela told Garcia that all they had in the vehicle was corn from the farm they had worked on earlier in the day. Garcia was displeased with Vela's answer and asked again. Garcia then forcefully searched the front pockets of Vela's pants and found about $5. Garcia put the $5 in his pocket and searched Vela's back pockets, where he found Vela's wallet and bandana. As Garcia removed the bandana from Vela's back pocket, $7 or $8 fell to the ground. When Vela reached to pick up the money off of the ground, Garcia instructed Vela to give him the money. Garcia put the money in his pocket and began inspecting Vela's wallet. Subsequently, Garcia put Vela's wallet in his pocket and ordered Vela and Rich to return within five or ten minutes with the $100 that Vela had previously referenced. Garcia then pushed Vela into Rich's vehicle and walked around to the driver's side of the vehicle where Rich was seated. Garcia proceeded to ask Rich if he had anything of value to which Rich replied that he only had corn. Now enraged, Garcia threatened to hunt down and kill them and Vela's grandparents if they did not return with the $100.[2] With Vela crying and Rich fearing for his life, they left for Vela's grandparents' house.

Upon arriving at his grandparents' house, Vela told his grandfather what had happened. Shortly thereafter, the police were called. Deputies Lindner and Padilla arrived at Vela's grandparents' house to inquire about the incident.

_____

[2] Vela testified that he lived with his grandparents at their house.

4

**B. Deputy David Lindner's Testimony**

Lindner testified that he is a Deputy Constable for Nueces County, Precinct 5, but that at the time the incident transpired, he was working for the City of Bishop Police Department. Lindner first became aware of the incident when his partner, Padilla, received a call on his radio from Phillip Rich, a Nueces County Sheriff's Deputy.[3] Lindner and Padilla proceeded to Vela's grandparents' house. Upon arriving, Lindner and Padilla interviewed Vela about the incident. Lindner noted that Vela was under a lot of stress and that his eyes were very red and watery. Vela then told Lindner and Padilla about the incident. Vela was very descriptive about the items taken and the items located in Garcia's residence. Vela also noted that Garcia did not act like he was joking when he was demanding the money. After interviewing Vela, Lindner and Padilla went over to Garcia's residence. Garcia was not there, so the deputies left a message with Barrientes, who was apparently living with Garcia at the house. About five minutes later, Lindner received a call from Barrientes notifying him that Garcia had returned; therefore, Lindner went back to Garcia's house. Lindner noticed that Garcia was dressed exactly as Vela had described. Later, Lindner read Garcia his *Miranda* rights and began to describe the incident as Vela had previously told him. *See generally Miranda v. Arizona*, 384 U.S. 436 (1966). Lindner testified that at no point did Garcia deny that the incident took place.[4] Garcia merely stated that the whole incident was a misunderstanding and that he and Vela were "just playing around." After Lindner asked about Vela's wallet, Garcia stated that Vela had left the wallet inside the house on top of a bed. Lindner then asked about the money that Vela

---

[3] Nueces County Deputy Phillip Rich is Andrew Rich's uncle. Andrew noted that he had called Phillip on his cell phone to tell him about the incident.

[4] Mario was also present during Lindner's questioning of Garcia, and at no point did Mario deny that the events in question had transpired.

alleged Garcia had stolen and about the knife; Garcia denied any knowledge of the money and denied owning a knife. After placing Garcia under arrest, Lindner conducted a search of the residence. Lindner found Vela's wallet on top of a bed but did not find a knife in either the living room or the kitchen of Garcia's house.

The next day, Vela produced a written statement describing the incident. Lindner witnessed the statement. Rich produced a written statement a few days later which Lindner also witnessed. In compiling his police report, Lindner read both written statements provided by Vela and Rich and determined that the statements were consistent.[5] Lindner also testified that based on his training and experience, a knife is a weapon that could cause death or serious bodily injury.

## C. Deputy Rolando Padilla's Testimony

Padilla testified that when he first responded to the disturbance call, he noticed that Lindner had already arrived on the scene and was taking Vela's statement. Padilla noticed that Vela was visibly upset and shaking. Padilla noted that he assisted Lindner in searching Garcia's house, but neither law enforcement officer found a knife. However, Lindner and Padilla did find Vela's wallet lying on a bed in Garcia's house.

## D. Andrew Rich's Testimony

Rich corroborated Vela's testimony regarding the encounter with Garcia. Specifically, Rich noted that Vela began to cry out of fear when Garcia instructed Vela to come inside the house and told him not to run away. Rich testified that Garcia ordered him to stay where he was and to turn the car off prior to entering the house with Vela. Garcia threatened Rich that if he failed to comply, he would kill him. Rich testified that as a result

---

[5] At trial, Garcia argued that the statements produced by Vela and Rich were inconsistent because Rich had failed to mention some details of the incident.

of Garcia's threats, he was fearful for his life.  Rich stated that at no point in time was Garcia acting in a joking manner; instead, Garcia was angry and serious.  Once Vela returned from Garcia's house, Rich noticed that Vela was "crying and really scared."  As Garcia accompanied Vela to Rich's car, Rich saw that Garcia was holding a knife with a black handle and silver blade.  Rich believed that the knife was capable of hurting him or even killing him.  Later, at the urging of Lindner, Rich produced a written statement about the incident.  Rich admitted that he did not include every detail in the written statement because Lindner had only told him to write a "summary."

## E. Garcia's Testimony

Garcia testified that at the time of trial, he was twenty-two years old and that he was employed doing yard work and working "at the grains" in Bishop.  Garcia noted that he did not wave over Vela and Rich but that Vela and Rich stopped by on their own accord to ask where Mario was.  According to Garcia, both Vela and Rich exited Rich's vehicle and the three began talking.  As they were talking, Garcia and Vela began "horseplaying."  Garcia testified that Vela pushed him and that he pushed Vela back, but that "it wasn't nothing really serious."  However, Garcia noted that the pushing eventually became serious. Garcia alleged that Vela continually provoked him and that he took off his jewelry because the two were "horseplaying."  Garcia admitted that he did push Vela and that Vela landed on top of the nearby car.  Garcia denied:  (1) asking Vela for money; (2) threatening the lives of Vela or Rich; (3) forcing Vela inside his house; (4) threatening to slit Vela's throat; or (5) owning a knife.  Essentially, Garcia denied committing any offense.  Garcia claimed that Vela's story was a fabrication to frame him for this offense.  Garcia testified that Vela left his wallet at his place and that it was not his intent to steal Vela's wallet.  Because he was employed at the time, Garcia theorized that he had no need for Vela's money.  Garcia

7

noted that when the police arrived, he "was down the street."[6] When the police returned to his house a second time, Garcia was waiting for them. Upon questioning, Garcia informed Lindner and Padilla about Vela's wallet and consented to a search of his house for the knife.

On cross-examination, the State asked Garcia if he had been previously convicted of a crime of moral turpitude. In response to this question, Garcia stated that he had "been convicted of unauthorized absence from the Service." The State then questioned Garcia about his service in the Marines. Garcia admitted that he had been discharged from the Marines for bad conduct because he was absent without leave ("AWOL"). With respect to Garcia's discharge, the following exchange occurred:

| | |
|---|---|
| Q [The State]. | Okay. You just told the ladies and gentlemen of the jury the reason that you didn't tell the deputy, or—I'm sorry—he was an officer at the time—Officer Lindner about the wallet, about the bracelet, about everybody taking off their jewelry and horseplaying, blah, blah, blah, blah, blah, that you didn't tell him about that was because you knew you were going to catch a case for agg[ravated] robbery? |
| A [Garcia]. | No, I had no idea. I had never been—that's the only—the only time I've been in trouble is with the military. That was it. I didn't know I was going to be in trouble for no aggravated robbery. |
| Q. | But there have been several times with the military, haven't there; it wasn't just the AWOL, was it? |
| A. | It was AWOL and the use of cocaine, and that was it. |
| Q. | Isn't there one other one? |
| A. | No, ma'am. That's all there is. That's the only charge I ever got. |

---

[6] On cross-examination, the State questioned Garcia about whether he had disposed of the knife when he "was down the street." However, Garcia insisted that there was no knife. Garcia did not specifically address what he was doing "down the street."

The State then introduced a copy of Garcia's military record over objections made by Garcia that the records were not made available in discovery and were irrelevant and more prejudicial than probative.[7]  *See* TEX. R. EVID. 403.  The trial court admitted Garcia's military records under the premise that Garcia had "opened the door" and that the documents had been authenticated.  Garcia's military record included a report with the following notation referencing a December 10, 2004 offense:  "Counsel this date concerning my illegal drug involvement, specifically indicating trafficking, possession, usage and positive urinalysis for cocaine."  Garcia admitted that he used cocaine and that he had signed the report, but that the military had doctored the document to include the trafficking allegation.  Garcia also testified that (1) Mario was present during the alleged altercation and during Lindner's questioning, and (2) Mario did not ever state that Vela and Garcia were just "horseplaying" or that this was just a "misunderstanding."

## F. Martha Barrientes's Testimony

Barrientes testified that at the time of the incident, Garcia was employed and did not need any money.  Barrientes also recognized Vela and Rich as Manny's friends and that Vela and Rich had visited Garcia's house on other occasions.  Barrientes denied ever seeing Garcia with a knife; however, Barrientes admitted that she does not keep a close eye on what Garcia does on a daily basis.

## II. LEGAL AND FACTUAL SUFFICIENCY

In his first issue, Garcia contends that the evidence supporting his conviction is legally and factually insufficient.  The State asserts that the evidence supporting Garcia's

---

[7] In response to Garcia's objection that his military records were not provided during discovery, the State argued that it has an open door policy and that Garcia had ample opportunity to access these records. The State also asserted that counsel for Garcia had looked through all of the State's documents on the day before trial.  Garcia did not re-assert this objection on appeal.

conviction was legally sufficient because, based on the testimony provided by Vela and Rich, a rational trier of fact could have found the elements of aggravated robbery beyond a reasonable doubt. The State also argues that the jury's verdict is not clearly wrong or manifestly unjust.

## A. Standard of Review

In a legal sufficiency review, we view the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *Watson v. State*, 204 S.W.3d 404, 414-17 (Tex. Crim. App. 2006). The trier of fact is the sole judge of the facts, the credibility of the witnesses, and the weight given to testimony. *See* TEX. CODE CRIM. PROC. ANN. art. 38.04 (Vernon 1979); *Jackson*, 443 U.S. at 318-19; *Beckham v. State*, 29 S.W.3d 148, 151 (Tex. App.–Houston [14th Dist.] 2000, pet. ref'd). We do not reevaluate the weight and credibility of the evidence, whether circumstantial or direct, nor do we substitute our own judgment for that of the trier of fact. *Mosley v. State*, 141 S.W.3d 816, 821 (Tex. App.–Texarkana 2004, pet. ref'd); *Beckham*, 29 S.W.3d at 151. Instead, we consider whether the jury reached a rational decision. *Beckham*, 29 S.W.3d at 151.

Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Barnes v. State*, 876 S.W.2d 316, 321 (Tex. Crim. App. 1994); *Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993); *Alexander v. State*, 740 S.W.2d 749, 758 (Tex. Crim. App. 1987)). Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor and alone can be sufficient to establish guilt. *Guevara v. State*, 152 S.W.3d

45, 49 (Tex. Crim. App. 2004). On appeal, both circumstantial and direct evidence cases are examined using the same standard of review. *Id.*

In a factual sufficiency review, we review the evidence in a neutral light to determine whether the evidence is so weak that the jury's verdict seems clearly wrong and manifestly unjust. *Watson*, 204 S.W.3d at 414-15. After considering all of the evidence in the record related to appellant's sufficiency challenge, we compare the evidence weighed by the jury that tends to prove the elemental fact in dispute with the evidence that tends to disprove it. *Santellan v. State*, 939 S.W.2d 155, 164 (Tex. Crim. App. 1997) (en banc). This Court will not reverse the jury's verdict unless we can say with some objective basis in the record that the great weight and preponderance of the evidence contradicts the verdict. *Watson*, 204 S.W.3d at 415.

We measure the sufficiency of the evidence by the elements of the offense as defined by the hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997); *Adi v. State*, 94 S.W.3d 124, 131 (Tex. App.–Corpus Christi 2002, pet. ref'd). "Such a charge would accurately set out the law, would be authorized by the indictment, and would not unnecessarily increase the State's burden of proof." *Malik*, 953 S.W.2d at 240. A person commits the offense of aggravated robbery "if he commits robbery as defined in Section 29.02, and he . . . uses or exhibits a deadly weapon . . . ."[8] TEX. PENAL CODE ANN. § 29.03(a)(2).

---

[8] As defined in section 29.02 of the penal code, a person commits the offense of robbery "if, in the course of committing theft as defined in Chapter 31 and with intent to obtain or maintain control of the property, he . . . intentionally or knowingly threatens or places another in fear of imminent bodily injury or death." TEX. PENAL CODE ANN. § 29.02(a)(2) (Vernon 2003). Chapter 31 of the penal code provides that a person commits theft "if he unlawfully appropriates property with intent to deprive the owner of the property." *Id.* § 31.03(a) (Vernon Supp. 2008).

**B. Discussion**

In arguing that the evidence supporting his conviction is legally and factually insufficient, Garcia states that "the evidence did not show a conscious objective or desire by Garcia to harm Vela but an objective by Garcia to defend himself against Vela's advances." Garcia further states that the State failed to prove beyond a reasonable doubt that he committed an aggravated robbery because there was inconsistent testimony whether a knife existed at all and because Vela and Garcia were merely "horseplaying."

We construe Garcia's first argument as an attack on the intent element of the offense. Intent is a question of fact that is within the sole purview of the jury; the jury may rely on its collective common sense and apply common knowledge and experience. *Brown v. State*, 122 S.W.3d 794, 800 (Tex. Crim. App. 2003). Intent may be inferred from the circumstantial evidence surrounding the incident including the acts, words, and conduct of the accused. *Guevara*, 152 S.W.3d at 50. Due deference must be accorded to the jury regarding the weight and credibiltiy of the evidence. *See Jones v. State*, 944 S.W.2d 642, 649 (Tex. Crim. App. 1996).

Vela testified that Garcia (1) repeatedly threatened Rich and him, (2) displayed a knife, and (3) stole his money and his wallet, thereby addressing each of the essential elements for the offense of aggravated robbery. *See* TEX. PENAL CODE ANN. § 29.03(a). Rich corroborated Vela's testimony with respect to Garcia's threats, his angry demeanor, and the existence of the knife. Rich also noted that he observed Vela crying prior to entering and after exiting Garcia's house, indicating that Vela was fearful of Garcia. Both Vela and Rich testified that Garcia's actions made them fearful of their lives and safety. On the other hand, Garcia denied all of the allegations made by Vela and Rich in their testimony and painted himself as the victim of Vela's aggressive advances. However,

12

"[w]hen the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the prosecution and therefore defer to that determination." *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 326). Based on the testimony, the jury was justified in inferring that Garcia intended to commit the offense of aggravated robbery. *See* TEX. PENAL CODE ANN. § 29.03(a)(2).

Garcia's second argument, that he and Vela were merely "horseplaying," is not supported by the record. "Appellate courts should afford almost complete deference to a jury's decision when that decision is based upon an evaluation of credibility." *Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008). "The jury is in the best position to judge the credibility of a witness because it is present to hear the testimony, as opposed to an appellate court who relies on the cold record." *Id.* The jury may choose to believe some testimony and disbelieve other testimony. *Id.* at 707.

Both Vela and Rich testified that Garcia threatened them and that Garcia stole money from Vela using a knife. Furthermore, both Vela and Rich testified that they feared for their lives, and neither believed that Garcia was merely engaging in "horseplay." In arriving at its verdict, the jury clearly believed Vela's testimony to be credible while concluding that Garcia's testimony was not. We must defer to the jury's determination. *See Clayton*, 235 S.W.3d at 778.

We disagree with Garcia's third argument that the existence of inconsistent testimony regarding the existence of the knife rendered the evidence supporting his conviction legally insufficient. Once again, both Vela and Rich noted that Garcia brandished a knife in committing the robbery; they both identified the knife as having a black handle and a silver blade. Conversely, both Garcia and Barrientes denied that Garcia ever possessed a knife.

13

However, this Court has held that contradictory testimony from witnesses does not render the evidence insufficient. *See Davila v. State*, 147 S.W.3d 572, 575 (Tex. App.–Corpus Christi 2004, pet. ref'd) (citing *Mercado v. State*, 695 S.W.2d 25, 29 (Tex. App.–Corpus Christi 1985), *aff'd*, 718 S.W.2d 291 (Tex. Crim. App. 1986)). The jury was justified in believing the testimony of Vela and Rich over that of Garcia with respect to the existence of the knife.[9] *See Clayton*, 235 S.W.3d at 778; *see also Hunter v. State*, Nos. 01-00-00722-CR & 01-00-00726-CR, 2001 Tex. App. LEXIS 4532, at **4-6 (Tex. App.–Houston [1st Dist.] July 5, 2001, no pet.) (mem. op., not designated for publication) (affirming a conviction for aggravated robbery even though the firearm used in the commission of the offense was never found); *Jeffery v. State*, No. C14-84-329-CR, 1985 Tex. App. LEXIS 6581, at *3 (Tex. App.–Houston [14th Dist.] Apr. 25, 1985, no pet.) (mem. op., not designated for publication) (upholding a conviction for aggravated robbery even though the deadly weapon was not found). In addition, Lindner testified that the knife that Vela and Rich identified was capable of causing death or serious injury. *See Davidson v. State*, 602 S.W.2d 272, 274 (Tex. Crim. App. 1980) (holding that simply a description of a knife by size and shape is not enough evidence to support a determination that the knife was a deadly weapon without evidence of the manner of its use and capacity to produce death or serious bodily injury).[10] Based on the foregoing, we conclude that the cumulative

---

[9] Texas courts have held that in determining whether a knife was used as a deadly weapon within the context of an aggravated robbery, we must consider "the manner of the knife's use or intended use, its size and shape, and its capacity to produce serious bodily injury" and that "[t]estimony pertaining to the size of the blade, the blade's appearance of sharpness, the use of any brandishing motions, or the victim's fear of serious bodily injury or death, can all be offered to establish that a knife is a deadly weapon." *See Davidson v. State*, 602 S.W.2d 272, 273 (Tex. Crim. App. 1980); *Hicks v. State*, 837 S.W.2d 686, 690 (Tex. App.–Houston [1st Dist.] 1992, no pet.).

[10] In *Davidson*, appellant was convicted of aggravated robbery for stealing film from a store and threatening employees with a knife. 602 S.W.2d at 273. The knife was never found. *Id.* The court of criminal appeals reversed appellant's conviction for aggravated robbery because the State failed to proffer evidence as to the knife's manner of use and capacity to produce death or serious bodily injury. *Id.* at 274. However,

force of all the incriminating circumstances is sufficient to support Garcia's conviction for aggravated robbery. *See Hooper*, 214 S.W.3d at 13; *see also Guevara*, 152 S.W.3d at 49.

In his appellate brief, Garcia does not demonstrate how the evidence supporting his conviction was factually insufficient. *See* TEX. R. APP. P. 38.1. In any event, we cannot say, based on our review of the record, that the evidence supporting Garcia's conviction is so weak that the verdict was clearly wrong or manifestly unjust. *See Watson*, 204 S.W.3d at 414-15. Accordingly, we overrule Garcia's first issue on appeal.

## III. LESSER-INCLUDED OFFENSES

In his second issue, Garcia argues that the trial court erred in refusing to include an instruction for the lesser-included offenses of robbery, aggravated assault, and theft in the jury charge.[11] Garcia asserts that the record contains evidence "that would have permitedt [sic] a jury rationally to find appellant guilty (if at all) of the lesser offenses of robbery, aggravated assault[,] or theft." Conversely, the State asserts that there was no evidence from which a rational jury could have acquitted Garcia of aggravated robbery while convicting him of the lesser-included offenses of robbery, aggravated assault, or theft. In

---

appellant's conviction was not overturned on the basis of the knife not being found. *See id.* At trial, Garcia merely argued that there was uncertainty as to whether a knife existed at all.

[11] Article 37.09 of the code of criminal procedure provides that an offense is a lesser-included offense if:

(1) it is established by proof of the same or less than all the facts required to establish the commission of the offense charged;

(2) it differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property, or public interest suffices to establish its commission;

(3) it differs from the offense charged only in the respect that a less culpable mental state suffices to establish its commission; or

(4) it consists of an attempt to commit the offense charged or an otherwise included offense.

TEX. CODE CRIM. PROC. ANN. art. 37.09 (Vernon 2006).

15

particular, the State notes that because Garcia's theory at trial was that he did not commit any offense and because there was no evidence demonstrating that Garcia was only guilty of a lesser-included offense, a charge on a lesser-included offense was not required.

## A. Standard of Review

A defendant is entitled to an instruction on a lesser-included offense if (1) the lesser offense is a lesser-included offense of the charged offense, and (2) there is some evidence in the record that would permit a jury rationally to find that if the defendant is guilty, he is guilty only of the lesser offense. *Guzman v. State*, 188 S.W.3d 185, 188 (Tex. Crim. App. 2006). The court of criminal appeals recently analyzed article 37.09 of the code of criminal procedure and clarified the two-step analysis used in determining if a defendant is entitled to an instruction on a lesser-included offense. *Hall v. State*, 225 S.W.3d 524, 534-37 (Tex. Crim. App. 2007).

In the first step, the elements of the offense as alleged in the indictment are compared to the statutory elements of the potential lesser-included offense. *Id.* at 535-36. This determination is a question of law and does not depend on the evidence adduced at the trial. *Id.* at 535. If the greater offense may be committed in more than one manner, the manner alleged will determine the availability of lesser-included offenses. *Id.* at 531.

If the first step is satisfied, a reviewing court then proceeds to determine if there is some evidence that would permit a rational jury to find that the defendant is guilty of the lesser offense, but not guilty of the greater. *Id.* at 536. Anything more than a scintilla of evidence may be sufficient to entitle a defendant to a charge on the lesser offense. *Id.* "[I]t is not enough that the jury may disbelieve crucial evidence pertaining to the greater offense, but rather, there must be some evidence directly germane to the lesser-included offense for the finder of fact to consider before an instruction on a lesser-included offense

16

is warranted." *Hampton v. State*, 109 S.W.3d 437, 441 (Tex. Crim. App. 2003). We review all evidence presented at trial to make this determination. *Rousseau v. State*, 855 S.W.2d 666, 673 (Tex. Crim. App. 1993). If the evidence raises the issue of a lesser-included offense, a jury charge must be given based on that evidence, "'whether produced by the State or the defendant and whether it be strong, weak, unimpeached, or contradicted.'" *Id.* at 672 (quoting *Bell v. State*, 693 S.W.2d 434, 442 (Tex. Crim. App. 1985)).

## B. Discussion

### 1. Jury Instruction on Aggravated Assault and Theft

After both sides had rested, the trial court facilitated a charge conference in which the following exchange took place:

| | |
|---|---|
| MS. NEMER [Prosecutor]: | Basically, it's just a standard jury charge, just so you know. I'll call Ms. Graham [Garcia's trial counsel], and I'll let her, of course, see it. It's prepared by the District Attorney's office with him testifying, of course.<br><br>Originally, I thought there might be some lesser includeds of a robbery and an aggravated assault. I don't believe that that's come through. I think it's an all or nothing on the aggravated robbery. . . |
| MS. GRAHAM: | Well, I think there's a lesser included of robbery in there, maybe not aggravated assault, but— |
| MS. NEMER: | I don't honestly see how there's a predicate. He's saying he didn't do it. All the witnesses are saying that there was a knife. There has to be some evidence that, if he's guilty, he's only guilty of robbery. I don't see any evidence to that, Your Honor, do you? |
| MS. GRAHAM: | Well, I think from the facts that we need to determine if it's an aggravated robbery |

17

|  | or a regular robbery. |
| --- | --- |
| . . . . | |
| THE COURT: | I'm inclined to not to include a lesser included at this time . . . . |
| . . . . | |
| MS. GRAHAM: | Well, I mean there is evidence in here where the jury can make a decision on the finding of robbery. I mean, if they decide that there was no knife. |
| . . . . | |
| MS. NEMER: | —there has to be—I can bring you the case—I'm sure Your Honor doesn't need the case law. You've done enough jury charges. Your Honor knows that in order for him to be—a lesser included to be included, there must be some evidence that if he's guilty of anything, he's only guilty of that.<br><br>There has only been testimony that a knife was used. There is—you don't just automatically going [sic] to lesser included because someone might think something. It has—there has to actually be evidence that there was no knife. Not one person has gotten up there and said there was no knife, Judge. She's wrong. |
| MS. GRAHAM: | There's evidence of the theft and evidence of an assault, but the issue of the knife can be debated. That's why I say there's a lesser included of robbery included—that could be included in the jury charge. |
| . . . . | |
| THE COURT: | Yeah. No, I'm not going to, I'm not going to include a lesser included offense. |

Garcia's trial counsel later re-urged her objection to the trial court's refusal to include

18

an instruction on the alleged lesser-included offense of robbery. Garcia's trial counsel did not object to any other aspects of the jury charge and did not specifically allege that the jury should be charged on aggravated assault and theft. We conclude that Garcia failed to preserve his argument with respect to the trial court's refusal to include an instruction on aggravated assault and theft. *See* TEX. R. APP. P. 33.1; *see also Vasquez v. State*, 919 S.W.2d 433, 434 (Tex. Crim. App. 1996) (en banc) (holding that "[i]n order to preserve error relating to the jury charge[,] there must either be an objection or a requested charge") (citing *Boles v. State*, 598 S.W.2d 274, 278 (Tex. Crim. App. 1980)).

### 2. Jury Instruction on Robbery

Garcia was indicted for aggravated robbery and counsel for Garcia argued for a jury instruction on robbery at the charge conference. The parties do not dispute that robbery is a lesser-included offense of aggravated robbery, thus satisfying the first prong of the *Hall* test. *See* 225 S.W.3d at 535-36; *see also Neighbors v. State,* No. 2-07-176-CR, 2008 Tex. App. LEXIS 4467, at *14 (Tex. App.–Fort Worth June 12, 2008, pet. ref'd) (mem. op., not designated for publication) (concluding that robbery is a lesser-included offense of aggravated robbery) (citing *Ex parte Walton*, 626 S.W.2d 528, 530 (Tex. Crim. App. 1981); *Russell v. State*, 804 S.W.2d 287, 289 (Tex. App.–Fort Worth 1991, no pet.)). We must next determine if there is some evidence adduced at trial demonstrating that if Garcia is guilty, he is guilty of only robbery. *See Hall*, 225 S.W.3d at 536.

Garcia testified at trial that he had not committed any offense and denied the existence of the knife. The court of criminal appeals has held that "[a] defendant's own testimony that he committed no offense, or testimony which otherwise shows that no offense occurred at all, is not adequate to raise the issue of a lesser-included offense." *Lofton v. State*, 45 S.W.3d 649, 652 (Tex. Crim. App. 2001). Moreover, in *Bignall v. State*,

19

the court of criminal appeals concluded that "if a defendant either presents evidence that he committed no offense or presents no evidence, and there is no evidence otherwise showing that he is guilty only of a lesser-included offense, then a charge on a lesser-included offense is not required." 887 S.W.2d 21, 23 (Tex. Crim. App. 1994).

The jury, the sole judge of the credibility of witnesses and the weight afforded to their testimony, *see Beckham*, 29 S.W.3d at 151, concluded that the testimony of Vela and Rich was more credible than Garcia's and that a knife existed. If the jury did not believe that Garcia brandished a knife in the commission of the offense, then it would have acquitted Garcia. In addition, counsel for Garcia repeatedly argued that the existence of the knife was up for debate and this necessitated a jury instruction on robbery. However, as previously noted, "it is not enough that the jury may disbelieve crucial evidence [i.e., the existence of the knife] pertaining to the greater offense, but rather, there must be some evidence directly germane to the lesser-included offense . . . ." *Hampton*, 109 S.W.3d at 441. Even assuming that the existence of the knife was up for debate, that was not enough to warrant a jury instruction on a lesser-included offense. *See id.* Based on our review of the record, Garcia did not proffer any evidence directly germane to the lesser-included offense of robbery. We therefore conclude that the evidence adduced at trial does not support Garcia's contention on appeal that he was only guilty of robbery rather than aggravated robbery, and that the trial court did not err in refusing to include an instruction on robbery in the jury charge. *See id.*; *see also Hall*, 225 S.W.3d at 536. Garcia's second issue is overruled.

### IV. SELF-DEFENSE AND DEFENSE OF PROPERTY

In his third issue, Garcia argues that the trial court erred in refusing to include an instruction on self-defense and defense of property in the jury charge. The State contends

that the trial court did not err in refusing to include instructions on self-defense and defense of property because: (1) Garcia denied that any criminal act took place; (2) a robber has no right of self-defense against his victim; (3) there was no evidence presented that Vela used deadly force against Garcia; (4) Garcia consented to the force exacted by Vela; (5) the use of force against another is not justified if the actor provoked the other's use of unlawful force; (6) Garcia did not properly request such an instruction or object to the absence of the instructions; and (7) Garcia failed to present evidence raising the issue.

## A. Standard of Review

An accused is entitled to an instruction on any defensive issue raised by the evidence, whether that evidence is weak or strong, unimpeached or contradicted, and regardless of what the trial court may think about the credibility of the evidence. *Granger v. State*, 3 S.W.3d 36, 38 (Tex. Crim. App. 1999); *Hudson v. State*, 145 S.W.3d 323, 324-25 (Tex. App.–Fort Worth 2004, pet. ref'd). But when the evidence fails to raise a defensive issue, the trial court commits no error in refusing a requested instruction. *Muniz v. State*, 851 S.W.2d 238, 254 (Tex. Crim. App. 1993); *Hudson*, 145 S.W.3d at 325.

## B. Discussion

At the jury charge conference, the following exchange occurred:

MS. GRAHAM: And, Your Honor, there's evidence that he said that he was provoked. Can we include a—

THE COURT: A what.

MS. GRAHAM: —self-defense?

MS. NEMER: Absolutely not. There's no evidence that he was provoked.

. . . .

THE COURT: I'm not going to—I guess your request is denied

21

or your motion is denied.

With respect to a defendant's entitlement to a self-defense instruction,[12] the Austin Court of Appeals noted the following:

> Self-defense, like other chapter nine defenses, justifies conduct that would otherwise be criminal. *Young v. State*, 991 S.W.2d 835, 838 (Tex. Crim. App. 1999) (necessity); *Wallace v. State*, 75 S.W.3d 576, 587 (Tex. App.–Texarkana 2002) (self-defense), *aff'd*, 106 S.W.3d 103, 109 (Tex. Crim. App. 2003). In other words, the defendant must "admit" violating the statute under which he is being tried, then offer a statutory justification for his otherwise criminal conduct. *Young*, 991 S.W.2d at 838. Thus, a defendant is not entitled to a jury instruction on self-defense if, through his own testimony or the testimony of others, he claims that he did not perform the assaultive acts alleged, or that he did not have the requisite culpable mental state, or both. *Ex parte Nailor*, 149 S.W.3d 125, 134 (Tex. Crim. App. 2004); *East v. State*, 76 S.W.3d 736, 738 (Tex. App.–Waco 2002, no pet.); *Wallace*, 75 S.W.3d at 587; *Gilmore v. State*, 44 S.W.3d 92, 97 (Tex. App.–Beaumont 2001, pet. ref'd); *Anderson v. State*, 11 S.W.3d 369, 372 (Tex. App.–Houston [1st Dist.] 2000, pet. ref'd). . . . In each of these cases, *all* the defensive testimony was to the effect that the defendant did not commit the alleged acts, and the defendant was thus not entitled to a self-defense instruction because there was *no evidence* that he acted in self-defense.

*VanBrackle v. State*, 179 S.W.3d 708, 715 (Tex. App.–Austin 2005, no pet.) (emphasis in original). Moreover, the court of criminal appeals has held that a robber has no right of self-defense against his victim. *See Westley v. State*, 754 S.W.2d 224, 230 (Tex. Crim. App. 1988). In the present case, Garcia contended that he did not commit any offense and that he and Vela were merely "horseplaying." Because there was no evidence adduced at trial raising self-defense and because Garcia denied committing any offense, we conclude that the trial court did not err in refusing to instruct the jury about self-defense. *See Westley*, 754 S.W.2d at 230; *VanBrackle,* 179 S.W.3d at 715; *see also Muniz*, 851

---

[12] Section 9.31 of the penal code provides that "a person is justified in using force against another when and to the degree he reasonably believes the force is immediately necessary to protect himself against the other's use or attempted use of unlawful force." TEX. PENAL CODE ANN. § 9.31(a) (Vernon Supp. 2008). Subsection (b) also provides that the use of force is not justified "in response to verbal provocation alone." *Id.* § 9.31(b)(1).

S.W.2d at 254; *Hudson*, 145 S.W.3d at 325. With respect to his defense of property contention,[13] Garcia has provided neither argument nor authority in support of his contention; therefore, this argument is inadequately briefed. *See* TEX. R. APP. P. 38.1. In any event, the refusal to instruct the jury on defense of property is not error when there is no evidence of a defendant's reasonable belief that force was necessary to recover his property. *MacDonald v. State*, 761 S.W.2d 56, 61 (Tex. App.–Houston [14th Dist.] 1988, pet. ref'd). The evidence does not demonstrate that Garcia's actions towards Vela and Rich amounted to a defense of his property. In fact, Garcia did not testify that either Vela or Rich intended to deprive him of his property. Therefore, we conclude that the trial court did not err in refusing to include an instruction on defense of property. Accordingly, we overrule Garcia's third issue.

## V. THE STATE'S USAGE OF GARCIA'S MILITARY RECORDS

In his fourth issue, Garcia argues that the State's usage of his military service record substantially prejudiced his case and that the records were improperly used to prove conformity of his conduct. *See* TEX. R. EVID. 403, 404(b). The State counters by arguing that Garcia's military records were properly used to impeach his testimony that allegedly created a false impression about his prior trouble with military authority. Arguing that this "case was essentially a swearing match between the victim and Appellant" and the "outcome hinged on credibility assessments," the State asserted that Garcia's military records were relevant and admissible because he opened the door when he "represented to the jury that the only time he had previously been in trouble was when he was in the

---

[13] Section 9.41 of the penal code provides that a person is justified in using force in protection of his own property "when and to the degree the actor reasonably believes the force is immediately necessary to prevent or terminate the other's trespass on the land or unlawful interference with the property." *Id.* § 9.41(a) (Vernon 2003).

23

military and that it was only for cocaine use and being AWOL . . . ."

## A. Standard of Review

The admission of evidence is reviewed under an abuse of discretion standard. *Montgomery v. State*, 810 S.W.2d 372, 379-80 (Tex. Crim. App. 1990) (op. on reh'g).  As long as the trial court's ruling was within the "zone of reasonable disagreement," there is no abuse of discretion, and we must uphold the trial court's ruling.  *Id.* at 381.  Relevant evidence may be excluded if its probative value is substantially outweighed by its prejudicial effect.  TEX. R. EVID. 403.  However, rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial.  *Shuffield v. State*, 189 S.W.3d 782, 787 (Tex. Crim. App. 2006).  In conducting a rule 403 analysis, we may consider, among other things:  (1) how probative the evidence is; (2) the potential of the evidence to impress the jury in some irrational, but nevertheless indelible way; (3) the time the proponent needs to develop the evidence; and (4) the proponent's need for the evidence.  *Id.*

However, under the opened-door doctrine, a defendant cannot intentionally broach a subject and then complain when the subject is subsequently pursued by the State. *Mares v. State*, 52 S.W.3d 886, 890 (Tex. App.–San Antonio 2001, pet. ref'd); *see Delk v. State*, 855 S.W.2d 700, 705 (Tex. Crim. App. 1993), *overruled on other grounds by Ex parte Moreno*, 245 S.W.3d 419, 425 (Tex. Crim. App. 2008) ("Where the witness creates a false impression of law abiding behavior, he 'opens the door' on his otherwise irrelevant past criminal history and opposing counsel may expose the falsehood."); *Green v. State*, 831 S.W.2d 89, 94 (Tex. App.–Corpus Christi 1992, no pet.) ("When the defendant 'opens the door' on an issue by attempting to present an incomplete picture of an incident, the State is permitted to complete the picture by presenting evidence that would otherwise

24

have been inadmissible.").

**B. Discussion**

We begin by noting that Garcia's trial counsel only objected to the State's introduction of Garcia's military records under rule 403. Tᴇx. R. Eᴠɪᴅ. 403. Specifically, Garcia's trial counsel argued that the prejudicial effect of introducing the records outweighed its probativeness. *See id.* On appeal, Garcia argues that the State improperly used the military records to prove conformity of his conduct. *See* Tᴇx. R. Eᴠɪᴅ. 404(b). However, Garcia's rule 404(b) objection was never made to the trial court. We therefore conclude that Garcia has not preserved this contention for appeal. *See* Tᴇx. R. Aᴘᴘ. P. 33.1 (providing that "[a]s a prerequisite to presenting a complaint for appellate review, the record must show that . . . the complaint was made to the trial court by a timely request, objection, or motion" stating the specific grounds for the desired ruling if the specific grounds are not apparent from the context); *see also Montgomery*, 810 S.W.2d at 388 (holding that an objection under both rules 403 and 404(b) is required to preserve error regarding the admission of evidence of an extraneous offense); *Zayas v. State*, No. 13-04-532-CR, 2005 Tex. App. LEXIS 9693, at **5-6 (Tex. App.–Corpus Christi Nov. 17, 2005, no pet.) (mem. op., not designated for publication) (concluding that the failure to specifically make a rule 403 or rule 404(b) objection to the trial court in a timely manner does not preserve error). As a result, we will focus on Garcia's rule 403 objection.

With respect to his rule 403 objection, Garcia does not argue on appeal exactly how the admission of his military records constituted an unfair prejudice. Garcia only states that "the evidence still created unfair prejudice when allowed to be entered as business records over defense objections." We conclude that this contention was inadequately briefed. *See* Tᴇx. R. Aᴘᴘ. P. 38.1.

25

Even assuming that Garcia had adequately briefed this contention, the record reflects that Garcia painted an inaccurate picture as to his disciplinary history while in the military. As previously mentioned, Garcia testified that he was only disciplined for going AWOL and for using cocaine. However, Garcia's military records indicated that he had previously engaged in drug trafficking as well. Because Garcia created a false impression of his law abiding behavior, he "opened the door" and the State was permitted to impeach him with his military records.[14] *See Mares*, 52 S.W.3d at 890; *see also Delk*, 855 S.W.2d at 705; *Green*, 831 S.W.2d at 94. Furthermore, at no point did Garcia request that the trial court issue a limiting instruction to the jury to consider the military records for impeachment purposes only. We conclude that the trial court did not abuse its discretion in admitting Garcia's military records because Garcia "opened the door." Accordingly, Garcia's fourth issue is overruled.

## VI. CONCLUSION

Having overruled all of Garcia's issues, we affirm the judgment of the trial court.

DORI CONTRERAS GARZA,
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Memorandum Opinion delivered and
filed this the 8th day of January, 2009.

---

[14] We need not address whether the military records were properly admitted under the business records exception to the hearsay rule because Texas courts allow the State to impeach a witness with evidence that would otherwise be inadmissible once the witness "opens the door." *See Green v. State*, 831 S.W.2d 89, 94 (Tex. App.–Corpus Christi 1992, no pet.). Moreover, Garcia only challenged the admission of the military records on rule 403 grounds. *See* TEX. R. EVID. 403.